# ATTACHMENT 2

Botting Letter

And

Letter of Sean Doak

**Gary Botting, Barrister**
M.A., Ph.D (English), J.D., LL.M., Ph.D. (Law)
1088 Grover Avenue, Coquitlam B.C. V3J 3G1
Telephone: 778 355 6106; fax: 778 355 0065
www.garybotting.com; garybotting@shaw.ca

2 April 2013

The Honourable Rob Nicholson, P.C., Q.C.
Minister of Justice
Department of Justice                     VIA FAX 1-613-990-7255
284 Wellington Street, Room 2274
Ottawa, ON K1A 0H8

Dear Mr. Nicholson:

### SUBMISSIONS TO THE MINISTER OF JUSTICE ON BEHALF OF SEAN DOAK

1. Mr. Doak has been committed for extradition for conspiracy to traffic in Schedule I, II, and III banned substances. The United States alleges that Mr. Doak "was *the* principal player in a criminal organization" that allegedly transported MDMA and marijuana into the United States from Canada and cocaine into Canada from the United States.

2. Mr. Doak completely denies and repudiates the allegations brought by the United States, and protests his complete innocence of these allegations. He denies that he used the BlackBerry monikers "Calisto" and "Physician" during the time in question.

3. The record shows that Mr. Doak has been detained by the Parole Board twice already in connection with these U.S. charges while the United States decided whether to proceed with extradition. The information contained in the sealed indictment against various accused, including Mr. Doak, came to the attention of officials in the Correctional Service of Canada (CSC) Parole office, who on two occasions suspended Mr. Doak's parole, initially on 5 March 2009 for more than two months; and again on 6 January 2010 for 10½ months.

4. On appeal to the Parole Board of Canada, Appeal Division, the suspension was eventually lifted or cancelled on the grounds that in suspending full parole, "the Board acted unfairly and exceeded its jurisdiction." (Tab 5F p. 2 ).

5. The Appeal Division of the Parole Board held that the allegations were merely *that* – and the presumption of innocence must prevail:

> To begin, we find that the Board presumed your guilt in relation to an outstanding charge set out in the US indictment. In this regard, the Board, in arriving at its conclusion to revoke your full parole, made the following determination:
>> "Moreover, your indictment by US authorities on a serious drug charge indicates that despite your period of incarceration and participation in correctional programming, your behaviour demonstrates that your propensity for criminal behaviour remains."
>
> In our view, this determination reveals that the Board considered the existence of your indictment in the US on an outstanding drug charge to support its conclusion that your *"behaviour"* demonstrated that you had become re-involved in *"criminal behaviour"*. This is unfair. The Board has no jurisdiction to find you guilty or innocent of outstanding charges…. The Board does not conduct a criminal trial process and the offender's guilt or innocence is not at issue. …
> (Tab 5F pp. 2-3)

6. Despite the decision being ultimately recognized as "unfair," Mr. Doak had to spend ten and a half months in custody while appealing the revocation, because access to the Constitutional right and remedy of Habeas Corpus under section 10(c) of the Canadian Charter Rights and Freedoms to determine the validity of his detention has been foreclosed by the decisions of this court in *John v. Canada (National Parole Board)*, 2011 BCCA 188 and *Woodhouse v. Canada (Correctional Service)*, 2012 BCCA 45.

7. Mr. Doak was arrested a third time on these allegations on 17 April 2012 and held for 18 days until Madam Justice Brown ordered his release on bail.

i) **The Nature of the Alleged Offences**

8. There is no dispute that the allegations of conspiracy to smuggle drugs across the border into the United States and back are serious in nature. However, Mr. Doak denies that had anything to do with this alleged conspiracy. Furthermore, as Brown J. found in ordering Mr. Doak's release on bail, a conspiracy such as the one alleged would require a lot of time to plan and resources to coordinate.

9. The United States contends that the conspiracy began in November 2007, six months after Mr. Doak began serving his seven year sentence for conspiracy to export marijuana – and nine months before his release on day parole (at the end of July 2008).

10. Mr. Doak was an inmate at William Head Institution, a medium security penitentiary on Vancouver Island, until released on day parole on 31 July 2008. Day parole is only partial parole; he remained supervised and was required to report back into custody each night throughout the term of his day parole. This rigid supervision continued for 3.6 months from 31 July 2008 to 21 November 2008. Thus he was in custody during the first nine months of the alleged conspiracy, and on day parole with rigid supervision for the following 3 months and three weeks (*not* 4.5 months, as the Attorney General contends). He was in custody again for most of the following two months, from 21 November 2008 to 15 January 2009.

11. Common sense dictates that if a complex conspiracy that required huge expenditures of time and resources was established in November 2007, the "principals" would have to have at least a modicum of freedom to set the machinery in place.

12. Here, Mr. Doak was in custody or under strict supervision throughout which would make it much more difficult, if not impossible, to engage in such a conspiracy as alleged, especially from an isolated penitentiary on Vancouver Island, as William Head is.

13. On behalf of the United States, the Attorney General argued: "These allegations, which follow on the heels of the Respondent being granted parole, are remarkably similar to the conduct for which he was convicted." (Para. 19) The perceived similarity arises from the attempt by the U.S. prosecutors to link the two cases together for precisely the purpose of casting suspicion on Mr. Doak, with whom they have long had an axe to grind. Sean Doak was on bail for six years pending that previous trial and sentencing without any breaches. That conspiracy pertained only to marijuana whereas the conspiracy alleged now applies to other drugs.

14. Mr. Doak was released on day parole for only a month before the alleged conspiracy came to a close in February 2009. The following month, 5 March 2009, his day parole was once again suspended when a former fellow inmate, Leonard Ferris, named him as a conspirator after being shown a newspaper article identifying Mr. Doak as a player in the latest conspiracy, an article sporting the photograph of Mr. Doak, and included in the Record of the Case (para. B; and Exhibit E).

15. The total time of the alleged conspiracy (November 2007-February, 2009) was 16 months maximum. The total time that Mr. Doak was in full custody in a penitentiary during that period was 12 months: (November 2007-31 July 2008 and 21 November 2008- 15 January 2009. The Attorney General's chart skews the timeline).

16. The total time that Mr. Doak was on day parole during that time was a little over four months: (31 July 2008-21 November 2008, and 15 January 2009 to February 2009). For day parole, the inmate lives in a halfway house, where he is required to obey a strict curfew. He is allowed to socialize or work during the day.

17. Once the Correctional Service of Canada Parole officer was informed of the allegations against him, on 5 March 2009 the officer suspended Mr. Doak's day parole.

18. The suspension was subsequently canceled by the Parole Board of Canada and Mr. Doak returned to the strictures of day parole from 12 May 2009 to 24 September 2009, when he became eligible for full parole and was redirected to full parole by the Parole Board to enable him to continue to serve the sentence subject to conditions and supervision and possible suspension were he to breach a condition.

19. Ms. Hudson, a care aide and behaviour interventionist, deposes that in March 2009 she commenced a committed relationship with Sean Doak. "I have never witnessed a phone call that I thought was suspicious. I have never witnessed anyone come over and have any sort of out of the ordinary conversation, I have never witnessed him having any secret conversations with anybody who visited. I have witnessed absolutely nothing in any way, shape or form that leads me to believe that Sean has been involved in any sort of criminal behaviour at all since I have been with him." ( Affidavit of Julie Hudson, sworn 11 December 2012, para. 5)

20. Ms. Hudson swears that she would know if Sean was acting suspiciously in any way since they spent "every waking moment" (i.e. when he was not under curfew at the halfway house) with him. "He did not act suspiciously at all" (para. 6).

21. She further swears, "To my mind it is impossible for Sean to have been one of the leaders in a massive conspiracy, as alleged, when I have never seen Sean do anything out of the ordinary or illegal at all, or heard him talk about anything illegal in my presence, either in person or on the telephone." (para. 7)

22. Mr. Doak's full parole was short-lived. In January 2010, when Mr. Doak's CSC parole officer found out about the existence of the U.S. Indictment for the first time, he once again suspended Mr. Doak's parole and referred Mr. Doak's case to the Parole Board of Canada. On March 17, 2010 the Parole Board of Canada revoked Mr. Doak's full parole. He appealed that decision to the Appeal Division of the Parole Board of Canada.

23. It took 10.5 months to process that appeal, which was ultimately successful. The appeal division ordered a new hearing and after a further parole board of Canada panel hearing the initial suspension was canceled and Mr. Doak was re-released on full parole on November 18, 2010. On 18 February 2011, the supervision of his parole was transferred to the CSC parole office in Vernon B.C., and Mr. Doak was given permission to move back in with his parents. Fourteen months later, he was arrested on an extradition warrant in the matter at bar, the Attorney General now asserting that allegations of his involvement in the conspiracy which has already resulted in the suspension of his parole on his current sentence, and his return to custody for more than a year without valid legal justification.

24. It is the contention of the defence that Mr. Doak had no opportunity to put such a complex conspiracy in motion while in custody at William Head Institution on Vancouver Island, and had no opportunity to become "the principal player in a criminal organization" either during the time he was in custody or while he was under the rigid supervision of day parole by Correction Canada.

25. It is simply hyperpole to suggest that the customers concerned are "Doak's customers" – thus reinforcing by rhetorical device that Mr. Doak is "*the* principal conspirator."

26. The only alleged connection of Mr. Doak to the alleged conspiracy is through two BlackBerry codes – "Callisto" and "Physician".

27. The only evidence linking either of these codes to Mr. Doak is the unsworn statement of Leonard Ferris, "who knew Mr. Doak from prison" (Oral judgment, para. 29). No such BlackBerry was found in Mr. Doak possession nor anything else to indicate that he used those codes, and while law enforcement agencies communicated with someone through those codes there is no evidence that it was Mr. Doak with whom they were communicating.

28. All that is known is that Leonard Ferris, who spent time in jail with Mr. Doak at William Head earlier on, was arrested on 21 February 2009. He and someone else in the alleged criminal organization used the code names Callisto and Physician for their own purposes – as a pseudonym to hide their identities.

29. Use of this kind of information stemming from a person akin to a jailhouse informant was thoroughly excoriated by Kaufman J. in the Morin Commission, and by Cory J. in the Sophonow Commission on wrongful conviction. It has no credibility whatsoever. Mr. Ferris gleaned what he knew about Mr. Doak – information that he shared with Agent Kanekoa – from his having being in prison with him. He knew that providing the BlackBerry identification names "Callisto" and "Physician" and identifying them as the code names of Sean Doak, would implicate an innocent man in the conspiracy. Agent Kanekoa's must also have known this when he presented Ferris with Mr. Doak's photograph published in a newspaper article about Mr. Doak earlier conviction.

30. Mr. Doak does not know to this day the identity of "Callisto" and "Physician." They could have been identities used by one or more of the co-accused - including Ferris.

31. The fact that Agent Kanekoa was convinced by Ferris that the person answering to "Callisto" or "Physician" was Sean Doak does not add credence to the allegation. If Ferris, knowingly or otherwise, was wrong in his identification, then Agent Kanekoa was wrong in his assumption – his surmise – that he was communicating with Sean Doak.

32. The Record of the Case does not specify which of the two BlackBerry names were used by Ferris or Kanekoa to make contact with the alleged conspirators, or how often.

33. Viewed this way, the case against Sean Doak is extremely weak, depending as it does on a single factor: that "Physician" or "Callisto" could refer only to him and not to someone else entirely. The Record of the Case admits as much.

34. As Hughes J. stated in her reasons for judgment, the Attorney General did not rely on the evidence of Cameron that the drug ring was led by two brothers, and the Record of the Case does not allege that Mr. Doak was or was not incarcerated at the time of the conspiracy. Since the Attorney General was not relying on this extraneous evidence, Hughes J. declined to admit evidence that soundly rebutted it.

35. The only evidence remaining is the expected uncorroborated evidence of Ferris, an unsavoury "jailhouse informant" who would say anything demanded of him to cast the blame elsewhere.

36. The only thing that Agent Kanekoa corroborates is that criminal activity was going on, and drugs were being transported for drop off or pick up. There is no corroboration whatsoever verifying that Mr. Doak was the person directing the activities. This conclusion is solely based on Ferris's tainted and suspect testimony.

37. In granting bail to Mr. Doak, Brown J. alluded to 1) Mr. Doak's history (a single, albeit serious, criminal conviction and a single failed urinalysis test); 2) the similarity of the allegations to the 2007 offences (in which, however, "it was clear that the Respondent made approximately 100 telephone calls a day dealing with the group's illegal operations" - an impossible occurrence while Mr. Doak remained in custody or on day parole, as required by the prosecution's theory of events with respect to the U.S. offences); 3) the "history of violations" while on supervised release (only one violation was upheld – the failed urinalysis test; all the other "violations" alluded to by the Attorney General in his submissions concerned the Parole Board's responses and reactions to the case at bar); and 4) that the alleged conduct occurred while the Respondent was on supervised parole (in fact the larger alleged conspiracy took place while the Respondent was in custody, when the window of opportunity was virtually nil).

38. Brown J. properly noted that since Mr. Doak's release in November 2010, "there have been no further parole breach allegations and the parole office had reduced the Respondent's reporting requirements."

39. There have been no new issues or concerns raised in more than four years.

40. In his request for a bail review on behalf of the United States, the Attorney General advanced the theory that Mr. Doak was "*the* principal player" in the alleged criminal enterprise (para. 2); he put "the seriousness of the alleged conduct" at the "furthest end of the spectrum." He thus attributed to Mr. Doak the ability, from within custody, while he was effectively out of circulation, to set up the "sophisticated criminal organization" that the United States describes in submissions as being so complex that its activities "required vast resources and careful deliberation" every step of the way.

41. Mr. Doak was either in custody or on day parole during the entirety of the alleged conspiracy, rendering involvement in such a complex criminal enterprise virtually impossible.

42. Not only is there a lack of credible corroboration of the allegation against Mr. Doak, but the Correctional Service of Canada and the Parole Board of Canada have continued to monitor and supervise Mr. Doak in prison and on day and full parole both before and after these allegations. While initially concerned, they have since reviewed them in detail and continue to support Mr. Doak's manageability on full parole. From this it can be inferred that the parole officers do not regard the allegations against Mr. Doak as credible. The CSC parole officers are the ones who have been working with Mr.Doak on a daily basis and have seen no evidence of his risk increasing to warrant further suspension and referral to the PBC.

43. The fact that the alleged conduct occurred while Mr. Doak "was serving a sentence for an offence that was virtually identical to those allegations" goes more to the absurdity of the U.S. prosecutor pressing ahead with the current charges on such weak evidence (that of Ferris) than to Mr. Doak's involvement in any conspiracy.

### ii) Criminal Record

44. Mr. Doak had no criminal record prior to his conviction on 31 May 2007 for conspiracy to export marihuana. For that, he received a seven year sentence. He served 14 months in custody before being released on day parole, which was suspended 3.5 months later but that suspension was cancelled by the Parole Board of Canada. He served a total of 28.5 months in custody and 10 months on day parole before being directed to full parole. While that parole was suspended on account of these allegations, ultimately it was re-instated after the Appeal Division of the board directed a new hearing which resulted in the reinstatement on 18 November 2011.

45. Brown J. noted at para. 40 of her judgment granting bail that "the nature of offences ... are remarkably similar to those for which Mr. Doak has been convicted in Canada."

46. In fact, the allegations against Mr. Doak, including the allegation that he is "the principal" conspirator precisely mirror those for which he was charged in 2007, the only difference being the type of drugs involved.

47. Holmes J. was only concerned with whether the alleged conduct was criminal in Canada. She did not consider the implausibility of Mr. Doak being able to commit the alleged conduct from within jail or while on day parole.

48. With respect, as Minister of Justice, you should have enough confidence in the efficacy of your own government's Correctional Service of Canada to question the credibility of these new allegations.

49. If Mr. Doak could perform such deeds while in a remote federal penitentiary or in a halfway house, then the entire security system of CSC should come under public scrutiny. Were a formal inquiry into how this total breach of the correctional system could have occurred, it would find that Mr. Doak was at all times compliant with the authorities within the CSC while incarcerated, and that there was no evidence of access to cell phones of any kind. His activity in the short time after his release was monitored by CSC at a halfway house and by his common law wife, Julie Hudson, who saw absolutely nothing suspicious. The allegations are simply far-fetched, based on wishful thinking by the U.S. authorities who have relied entirely on the speculation of, and possibly manipulation by, a jailhouse snitch who knew Sean Doak from prison.

    iii)    **Mr. Doak's Personal Circumstances**

50. Mr. Doak's grave medical conditions are summarized by Dr. Stephen Wright at Tab 5B of the hard copy of these submissions. His personal circumstances, including his industriousness and plain decency as a human being, are chronicled in the various letters of support and affidavits from his parents, girlfriend, neighbours and acquaintances, attached to these submissions.

51. Mr. Doak has serious health issues including ulcers, enlarged heart, arthritis, back pain, frequent urination, possibly fibromyalgia, and severe obesity.

52. He has been on a wait list for a gastric bypass operation since November 2009, and has been informed that if he is incarcerated, he will be removed from the wait list.

53. Mr. Doak weighs more than four hundred pounds and is extremely concerned with his life expectancy. He has been told by his doctor and believes that if he does not get the gastric bypass his life expectancy may be reduced by twenty years or more.

### iv. Section 44(1)(a) of the Act – "Reasons for Refusal"

54. You are bound by section 44(1)(a) of the Act, which states: "The Minister shall refuse to make a surrender order if the Minister is satisfied that (a) the surrender would be unjust or oppressive having regard to all the relevant circumstances."

55. Surrender would be unjust because his involvement in the alleged conduct is simply not credible. Since his release he has been very industrious and has lived an exemplary life.
    a. He has shown diligence and industry and has attended school to achieve his grade 12, including Pre-Calculus 11 with 83%, English 12 with 75%, communications 12 with 81%, and computers 11 with 93%;
    b. He has registered at the University of Athabasca for the Bachelor of Computer Information Systems;
    c. He has volunteered on a monthly basis at Silver Hills Health Retreat demonstrating vegan products he has created;
    d. He has volunteered weekly meetings with the CSC employed psychologist to assist him with maintaining the crime-free life that he has lived for a number of years, and dealing with personal health issues;
    e. He has the support of his parents who are upstanding citizens in the community. His parents have sworn affidavits that they have never witnessed suspicious behaviours from Sean since his arrival in Vernon in February of 2011. They both recognise Mr. Doak's change in life and support him wholeheartedly;
    f. He has the support of his girlfriend, Julie Hudson, who is employed with the Ministry of Family and Child Services and does not approve of drugs. Julie has been with Sean since just after this allegation and has sworn affidavits that she has never seen any illegal behaviour at all from Sean; rather the opposite;
    g. He has the support of the Alliance Church which he attends regularly;
    h. He has put significant efforts into building a food cart for the sale of his vegan/vegetarian products, which has recently been approved by the health authority;
    i. He has poor health, as do his parents.

56. As can be seen from the attachments, his physical health is particularly concerning. A surrender order would be a death warrant for him, because the United States is bound to keep him incarcerated until any trial. He would therefore not receive the necessary surgery that would extend his life, and he would be subject to abject misery month after month, forced to sleep on a cot far too small for him with prison-issue clothes many sized too small. For a man weighing in excess of 400 lbs, this would constitute torture. Certainly to subject him to that "would be unjust or oppressive having regard to all the relevant circumstances." Subsection 44(1)(a) prevails over the provisions of the Treaty.

*Nemeth v. Canada (Justice)*, [2010] S.C.J. No. 56 (S.C.C.), paras. 69-71

57. Sending a person with a severe disability such as morbid obesity to be incarcerated in a foreign country without likelihood of appropriate treatment (for which Mr. Doak is currently high on a waiting list) would be a treatment or punishment that would shock the conscience of the Canadian people. "The punishment is so extreme that it becomes the controlling issue in the extradition and overwhelms the rest of the analysis."

*United States of America v. Burns*, [2001] S.C.J. No. 8, [2001] 1 S.C.R. 283 (S.C.C.)

58. While your being "satisfied" that the surrender would be unjust or oppressive in all the circumstances is "entirely" a matter of your discretion, nonetheless your discretion also extends to matters beyond or outside of the Charter. This is one such case.

*Canada (Justice) v. Fischbacher*, [2009] S.C.J. 46, [2009] 2 S.C.R. 170, para. 37, 47

**Section 44(1)(b)**

59. Paragraph 44(1)(b) specifies that the "The Minister shall refuse to make as surrender order if the Minister is satisfied that ...

(b) the request for extradition is made for the purpose of prosecuting or punishing the person by reason of their race, religion, nationality, ethnic origin, language, colour, political opinion, sex, sexual orientation, age, mental or physical disability or status or that the person's position may be prejudiced for any of those reasons.

60. A narrow, legalistic reading of the paragraph may lead one to conclude that the only way a person with Mr. Doak's overall physical disabilities could meet the criteria is if the United States were to announce its intention to prosecute or punish him (for example), for being morbidly obese, or prosecute or punish him for some other physical disability that the requesting stated regards as prosecutable or punishable. However, it is inconceivable that any country would go out of its way to extradite someone in order to punish him simply because he has a physical disability. This reading is simply absurd. Obviously the section with its high-sounding mirroring of section 15 of the Charter must mean something other than that "the request for extradition is made for the purpose of prosecuting or punishing the person by reason of their ... physical disability."

61. Substituting any of the other labels listed in section 44(1)(b) brings us to the same conundrum. Why in this day and age would any nation make a specific extradition request for the purpose of prosecuting or punishing the person *by reason* of their race, or ethnic origin, colour, religion, language, nationality? Why on earth would any other nation want to extradite someone from another country solely in order to prosecute or punish a person for his mental disability? Or, in this case, his physical disability?

62. Paragraph 44(1)(b) is an example of bad drafting. Its plain meaning cannot conceivably be applied in a real-life situation. The only way to make sense of it is to rely on the last phrase: "or that the person's position may be prejudiced for any of those reasons." Mr. Doak's position *is* seriously prejudiced by virtue of his physical disability.

63. On behalf of Mr. Doak we respectfully request that you order his discharge pursuant to section 48(1) of the *Extradition Act*.

Respectfully Submitted

*[signature]*

Gary Botting, Ph.D., Barrister and Solicitor

## INDEX OF ATTACHEMENTS

TAB

1. Submissions on Discharge

2. Letter of Dr. Stephen Wright dated April 25, 2012

3. Criminal Record for Sean William Doak

4. Chronology if Sean William Doak's parole history prepared by Darlene Wood, Parole Officer, dated April 25, 2012

5. Affidavit of Danielle Lukiv sworn April 25, 2012

6. Authority to Proceed issued April 5, 2012

7. Record of the Case certified March 26, 2012

8. Letter of Susan Roe, Assistant United States Attorney, dated April 17, 2012

9. Sean William Doak's Submissions Re: Judicial Interim Release dated April 25, 2012

10. Requesting States Submissions Re: Judicial Interim Release dated April 26, 2012

11. Affidavit of Julie Hudson, dated December 11, 2012

**Sean Doak, Currently on Disability**
President of New Times New Foods
I-894 Head Road, Armstrong, BC, V0E 1B7
Telephone: 250 307 4034; fax:
www.newtimesnewfoods.vpweb.ca; newtimesnewfoods@gmail.com

The Honourable Rob Nicholson, P.C., Q.C.
Minister of Justice
Department of Justice          VIA FAX 1-613-990-7255
284 Wellington Street, Room 2274
Ottawa, ON K1A 0H8

April 12 2013

Dear Mr. Nicholson:

The purpose of this letter is to address a letter in tab 12, page 4 of the addendum titled Cardiology Clinic Report with collected date of 09-nov-2012. In this document Dr. Smylie says starting at line 6:

> "The problem with Sean, apart from his significant weight, is that he is non-compliant with his medications."

The side effects of the medications are extreme fatigue. As a heavy person with a weak heart I experience extreme fatigue on a daily basis and it is a fight to physically achieve much. For that reason I did not regularly take the prescribed medications.

At this particular visit with Dr. Smylie, he explained how the medications work and why it is so important to take those medications. As a result, I have been compliant ever since with taking the medications in efforts to prolong my life.

Respectfully,

Sean Doak

This letter was faxed from Gary Botting's office on, I believe, April 17th.

F13-007292